UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CADENCE BANK,** § | | |
| § | | |
| *Plaintiff,* § | | |
| § | | |
| § | | |
| V. § | Civil Action No.: 4:24-cv-01266 | |
| § | | |
| **TRITGEN, LLC and INDEPENDENT** § | | |
| **TEXAS RECYCLERS, LLC,** § | | |
| § | | |
| *Defendants.* § | | |

### BRIEF IN SUPPORT OF PLAINTIFF CADENCE BANK'S UNOPPOSED MOTION FOR APPOINTMENT OF RECEIVER

Plaintiff Cadence Bank (the "***Lender***") files this brief in support of its *Unopposed Motion for Appointment of Receiver, Injunctive Relief and to Set Bond* (the "***Receiver Moton***"). In support, the Lender respectfully states as follows:

### INTRODUCTION

The Lender, pursuant to Rule 66 of the Federal Rules of Civil Procedure (the "***Rules***") and under the inherent equitable powers of this Court, requests the appointment of a receiver to take possession and control of the Collateral (as defined below), including three recycling facilities located at 6810 Irvington Blvd., Houston, Texas 77022; 4711 Gasmer Drive, Houston, Texas 77035; and 5200 Jensen Drive, Houston, Texas, 77025 (collectively, the "***Facilities***").

The Lender seeks an order for the appointment of a receiver because Events of Default (as defined below) under the Loan Documents (as defined below) have occurred and are continuing. The Borrowers are unable to make the required monthly payments under the Loans (as defined below) or to otherwise pay operating expenses for the Facilities, and have expressly consented to the appointment of a receiver over the Facilities. Accordingly, for the reasons set forth below and

in the *Verified Original Complaint* (the "**Complaint**"), the Lender respectfully requests that the Court enter the proposed *Agreed Order Appointing Receiver* (the "**Receivership Order**") attached to the Receiver Motion as **Exhibit 1**.

## STATEMENT OF FACTS

**A.   The Loans**

1. On or about August 19, 2022, Lender, doing business as Cadence Equipment Finance (f/k/a Bancorp South Equipment Finance) made a term loan to the TRITgen, LLC ("***TRIT***") and Independent Texas Recyclers, LLC ("***ITR***"; collectively with TRIT, the "***Borrowers***") in the original principal amount of $7,244,094.45 (the "***Equipment Loan***").

2. The Equipment Loan is evidenced by, among other things, that certain Master Loan and Security Agreement by and between Borrowers and Lender dated August 19, 2022 (the "***Original Equipment Loan Agreement***"), as amended by that certain First Amendment to Master Loan and Security Agreement dated August 19, 2022 (the "***First Amendment to Equipment Loan Agreement***"), as further amended by that certain Second Amendment to Master Loan and Security Agreement dated August 26, 2022 (the "***Second Amendment to Equipment Loan Agreement***"), as further amended by that certain Third Amendment to Master Loan and Security Agreement dated August 28, 2023 (the "***Third Amendment to Equipment Loan Agreement***"; and collectively with the Original Equipment Loan Agreement, the First Amendment to Equipment Loan Agreement, and the Second Amendment to Equipment Loan Agreement, the "***Equipment Loan Agreement***"). A true and correct copy of the Equipment Loan Agreement is attached to the Complaint as **Exhibit A**.

3. Pursuant to the Equipment Loan Agreement, Borrowers granted Lender a security interest in, among other things, certain pieces of equipment as more particularly described in the

Equipment Schedule attached to the Equipment Loan Agreement (collectively, the "***Equipment Loan Collateral***").

4. Lender perfected its security interest in the Equipment Loan Collateral through filing a UCC financing statement with the Delaware Department of State as U.C.C. Initial Filing No. 20226971436 (the "***Equipment Loan UCC-1***"). A true and correct copy of the Equipment Loan UCC-1 is attached to the Complaint as **Exhibit B**.

5. Lender also made a revolving line of credit to Borrowers in the maximum principal amounts of $2,000,000.00 (the "***Revolving Loan***"; and together with the Equipment Loan, the "***Loans***").

6. The Revolving Loan is evidenced by, among other things, (i) that certain Note (Revolving Loans) executed by Borrowers in favor of Lender dated August 19, 2022 in the original principal amount of $2,000,000.00 (the "***Revolving Note***"); and (ii) that certain Credit Agreement by and between Borrower and Lender dated August 19, 2022 (the "***Original Revolving Credit Agreement***"), as amended by that certain First Amendment to Credit Agreement dated August 28, 2023 (the "***First Amendment to Revolving Credit Agreement***"; and collectively with the Original Revolving Credit Agreement, the "***Revolving Credit Agreement***"). True and correct copies of the Revolving Note and Revolving Credit Agreement are attached to the Complaint as **Exhibits C** and **D**, respectively.

7. The Revolving Loan is secured by, among other things, that certain Amended and Restated Security Agreement by and between Borrowers and Lender dated August 28, 2023 (the "***Security Agreement***"). A true and correct copy of the Security Agreement is attached to the Complaint as **Exhibit E**.

8. Pursuant to the Security Agreement, Borrowers granted Lender a security interest in all personal property of the Borrowers, including without limitation, all accounts and accounts receivable, general intangibles, inventory, goods, equipment, intellectual property, investment property, commercial tort claims and deposit accounts (collectively, the "***Revolving Loan Collateral***"; and together with the Equipment Loan Collateral, the "***Collateral***").

9. Lender perfected its security interest in the Revolving Loan Collateral through filing a UCC financing statement with the Delaware Department of State as U.C.C. Initial Filing No. 20227040587 (the "***Revolving Loan UCC-1***"; and together with the Equipment Loan UCC-1, the "***UCC-1s***"). A true and correct copy of the Revolving Loan UCC-1 is attached to the Complaint as **Exhibit F**.

10. The Equipment Loan Agreement, Revolving Note, Revolving Credit Agreement, Security Agreement, UCC-1s, the Forbearance Agreement (as hereinafter defined) and any and all other documents evidencing, describing, securing, or relating to the Loan are herein referred to as the "***Loan Documents***."

11. Pursuant to the terms of the Loan Documents, the Collateral secures all of Borrowers' obligations under the Loan Documents

**B.     Events of Default, Acceleration and Forbearance**

12. Borrowers failed to pay and perform their respective obligations under the Loan Documents, and multiple defaults occurred and remain outstanding under the Loan Documents, including, without limitation, the following (collectively, the "***Pre-Forbearance Defaults***"):

    a.  Borrowers failed to remit required payments of principal and interest due on April 19, 2023, May 19, 2023, June 19, 2023, July 19, 2023 under the Equipment Loan Agreement (the "***Monthly Payment Defaults***");

b. On or about May 16, 2018 ITR executed that certain Guaranty in favor of Closed Loop Fund, LP ("***CLF***") guarantying CLF's loan to Eco Glass Recycling LLC ("***EGR***"), which was not disclosed to the Lender until after closing of the Loans, (ii) ITR loaned approximately $625,000.00 to EGR which was not disclosed to the Lender until after the closing of the Loans, and (iii) TRIT borrowed approximately $300,000.00 from Robert Yosaitis prior to the closing of the Revolving Loan, which was not disclosed to the Lender until after the closing of the Revolving Loan (collectively, the "***Affiliate Loan Defaults***");

c. Borrowers were liable for past due trade payables other material past due accounts payable which were materially greater than those the Obligors disclosed to the Lender prior to closing of the Loans (collectively, the "***Payable Defaults***");

d. Borrowers failed to furnish the financial information required by Sections 5.01(a), (b), (c), and (f) of the Revolving Credit Agreement and submitted inaccurate and incomplete Compliance Certificates (as defined in the Revolving Credit Agreement) (collectively, the "***Reporting Defaults***"); and

e. Borrowers' Borrowing Base and Covenant Compliance certificate dated as of June 30, 2023 reflects that Borrowers failed to maintain the required Fixed Charge Coverage Ratio and Senior Leverage Ratio (each, as defined in the Revolving Credit Agreement) as required by Sections 5.13(a) and (b) of the Revolving Credit Agreement (collectively, the "***Covenant Defaults***").

13. Lender gave Borrowers written notice of the Pre-Forbearance Defaults on December 5, 2022, May 25, 2023, and July 14, 2023. A true and correct copy of the July default letter, which incorporates each of the prior default letters, is attached the Complaint as **Exhibit G**.

14. As a result of the Pre-Forbearance Defaults, Borrowers and Lender entered into that certain Forbearance Agreement dated August 18, 2023 (the "***Forbearance Agreement***"), pursuant to which Lender agreed to forbear from exercising its rights and remedies on account of the Pre-Forbearance Defaults until November 15, 2023.

15. In the Forbearance Agreement, the Borrowers acknowledged that "the [C]ollateral does not and will not be able to generate sufficient income to repay the Loans in accordance with the Loan Documents … [and] in [Borrowers'] current financial condition, they are not able and will not be able to generate sufficient income to repay the indebtedness owed to the Lender in accordance with the Loan Documents."

16. Borrowers failed to pay and perform their respective obligations under the Forbearance Agreement, and multiple defaults occurred and remain outstanding under the Loan Documents, including, without limitation, the following (collectively, the "***Forbearance Defaults***", and together with the Pre-Forbearance Defaults, the "***Events of Default***"):

   a. Borrowers failed to timely execute documents requested by Lender to effectuate the cross-collateralization and cross-default provisions of the Forbearance Agreement (the "***CCCD Default***");

   b. Borrowers failed to engage an independent accounting firm for the production of audited financial statements (the "***Forbearance Reporting Default***");

   c. Borrowers failed to cause a field examination and report to be completed on or before October 17, 2023 (the "***Field Examination Default***"); and

   d. Borrowers failed to remit (i) required proceeds received from the Swap Agreement on October 19, 2023, (ii) Borrowers' required monthly payment under the Equipment Loan on November 15, 2023, (iii) required $25,000 payment for the Catch-Up Debt (as defined in

the Forbearance Agreement), (iv) required $25,000 forbearance fee, (v) required $5,000 renewal fee and (vi) Lender's then outstanding attorneys' fees on account of the Borrowers' various defaults under the Loan Documents (collectively, the "**Forbearance Payment Defaults**").

17. Lender gave Borrowers written notice of the Forbearance Defaults on August 30, 2023, October 30, 2023, and August 30, 2023. A true and correct copy of the August default letter, which incorporates the each of the prior default letters, is attached the Complaint as **Exhibit H**.

18. Borrowers has failed to make a single payment to Lender under the Loans since November of 2023.

19. On March 13, 2024, Lender again gave Borrowers written notice of the Pre-Forbearance Defaults and Forbearance Defaults and notice of its intent to accelerate the Loans and declare the entire amounts outstanding on the Loans to be immediately due and payable and demanded that Borrowers cure each of the outstanding defaults. A true and correct copy of the March default letter is attached the Complaint as **Exhibit I**.

20. Despite demand, Borrowers failed to cure the outstanding Events of Default. On March 21, 2024, Lender gave Borrowers written notice of acceleration of the Loans and declared the entire amounts outstanding on the Loans to be immediately due and payable. A true and correct copy of the March notice of acceleration is attached the Complaint as **Exhibit J**.

21. Borrowers remain in default under the Loan Documents, and all amounts owing under the Loan Documents are immediately due and payable.

**C.    The Borrowers Consent to the Appointment of a Receiver**

22. As a result of the Events of Default and the Borrowers' failure to repay the Loans, Lender notified Borrowers of its intention to seek the appointment of a receiver over the Collateral and Facilities.

23. In response thereto, the Borrowers have consented to the appointment of a receiver and consented to the Court's entry of the Receivership Order attached to the Receiver Motion as **Exhibit 1**. Contemporaneously herewith, the Borrowers have filed with the Court written Consents to the Appointment of a Receiver evidencing their consent.

**D.   Proposed Receiver**

24. The Lender requests that Alan Wiener of Focus Management Group be appointed receiver in this matter. As evidenced by Mr. Wiener's declaration attached as **Exhibit 2** to the Receiver Motion, the Lender believes that Mr. Wiener's appointment as receiver is in the best interests of the Lender, the Borrowers and any other parties who might assert an interest in the Collateral and that Mr. Wiener has the requisite skills and resources to serve as the receiver in this case.

## ARGUMENT

This Court should enter the Receivership Order and appoint a receiver over the Collateral pursuant to Rule 66 because (a) the Borrowers have consented to the appointment of such a receiver and (b) even if the Borrowers had not consented to the appointment of a receiver, the Lender is entitled to the appointment of a receiver under the federal common law. *See* Fed. R. Civ. P. 66; *see also Franchise Loan Tr. 1998-I v. S & A Fee Properties SPE 2, L.L.C.*, 2008 WL 4093620, at *1 (E.D. Tex. Aug. 26, 2008), *report and recommendation adopted*, 2008 WL 4200016 (E.D. Tex. Sept. 12, 2008) (appointing receiver pursuant to secured creditor's rights under loan documents); *World Fuel Servs. Corp. v. Moorehead*, 229 F. Supp. 2d 584, 596 (N.D. Tex. 2002) ("The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles."). The appointment is in the sound discretion of the court. *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997).

**A.   The Borrowers Consent to the Appointment of a Receiver.**

The Borrowers expressly consent to the appointment of a receiver over the Collateral. As a consequence, the Lender is entitled to the appointment of a receiver over the Collateral.

Under similar facts, a Court appointed a receiver pursuant to a secured creditor's rights under certain loan documents. *See Franchise Loan*, 2008 WL 4093620, at *1. In *Franchise Loan*, the parties seeking appointment of a receiver were creditors with secured interests in improved real property. *Id*. The court held that the borrowers expressly consented to the appointment of a receiver over the property should they breach any covenant or agreement in the loan documents. *Id*. The court also found that the appointment of a receiver was in the best interests of the parties where the collateral was diminishing in value. *Id*. Here, there is no condition precedent to the Borrowers' agreement to the appointment of a receiver, and the Borrowers have filed their written consent to the appointment of a receiver with this Court.

B.  **The Lender is Entitled to the Appointment of a Receiver Under Federal Law.**

In addition, federal common law supports the appointment of a receiver here. *See U.S. Bank Nat'l Ass'n v. Lakeview Retail Prop. Owner LLC*, 2016 WL 2599145, at *2 (S.D. Miss. May 5, 2016). Under Rule 66, "the appointment of a receiver can be sought by anyone showing an interest in certain property or a relation to the party in control or ownership thereof such as to justify conservation of the property by a court officer." *Netsphere, Inc. v. Baron*, 703 F.3d 296, 305 (5th Cir. 2012) (quoting *Santibanez*, 105 F.3d at 241). Secured creditors, lienholders, and mortgagees may seek appointment of a receiver because they clearly have an interest in the property in which they have a security interest. *Id*. at 306.

The decision to appoint a receiver is in the sound discretion of the district court. *See Santibanez*, 105 F.3d at 241 (the form and quantum of evidence required on a motion requesting the appointment of a receiver is a matter of judicial discretion) (citing 12 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2983 (1973)); *Lakeview Retail Prop. Owner*

*LLC*, 2016 WL 2599145, at *2 (noting that a district court must take into account of all of the circumstances of the case instead of attempting to rely on a precise formula). In *Netsphere*, the Fifth Circuit stated that appointment of a receiver is justified "where [(1)] there is a clear necessity to protect a party's interest in property, [(2)] legal and less drastic equitable remedies are inadequate, and [(3)] the benefits of receivership outweigh the burdens on the affected parties." *Netsphere, Inc.*, 703 F.3d at 306. Further, courts have found that the appointment of a receiver is necessary where there is imminent danger that the collateral will diminish in value. *See Accordant Commc'ns, LLC v. Sayers Constr., LLC*, 2020 WL 7496657, at *3 (W.D. Tex. Apr. 7, 2020) (citing *Capital Funding, LLC v. TLTX Holdings, LLC*, 2020 WL 264106, at *5 (N.D. Tex. Jan. 17, 2020)). The *Netsphere* factors weigh in favor of appointing a receiver.

    1.    <u>There is a clear necessity for a receiver to protect Lender's interest in the Collateral</u>.

As stated herein, the Borrowers simply do not generate enough revenues to pay the indebtedness and the operating expenses of the Facilities. The Borrower's financial position and historical operation of the Facilities provide no assurance that they are now able or would soon become able to generate sufficient to pay operating expenses (let alone debt service). (*See* Complaint ¶ 21). There is an imminent danger of the Collateral or proceeds from the collateral being diminished in value. The immediate risk of Collateral diminution is clearly evidenced by the Borrowers' inability to pay either ongoing debt service or necessary operating expenses. *See Netsphere, Inc.*, 703 F.3d at 308 (stating that a receiver may be appointed for a secured creditor who has legitimate fears his security may be dissipated). This factor weighs in favor of appointing a receiver.

    2.    <u>Legal and less dramatic remedies are inadequate.</u>

The Borrowers have been unable to make a single payment to Lender under the Loans since November of 2023. (Complaint ¶ 24). If the Borrowers' business, including the use of the

Collateral in the Facilities, is forced to shut down operations, there will be no assets left to satisfy any money judgment. Therefore, monetary damages alone are inadequate and will not prevent further, irreparable harm to the Lender. To address these specific circumstances, the Receiver Agreement provide for, and the Borrower expressly consented to, the appointment of a receiver.

>    (a)   *The lack of a personal guaranty supports the appointment of a receiver.*

The Loans, while secured by the Collateral, are not also secured by any guaranties of affiliates or principals of the Borrowers. Because of the lack of any additional guarantors and the lack of any additional assets (other than the Collateral) or revenue streams of the Borrowers, the only avenue available to produce any recovery on the Loans is through the Collateral, and monetary damages will be insufficient to prevent irreparable harm to the Lender if the value of the Collateral is dissipated. *Accord Lakeview Retail Prop. Owner LLC*, 2016 WL 2599145, at *3 (noting that nonrecourse debt weighs in favor of appointing a receiver to protect the property, as "monetary damages may not suffice").

>    (b)   *An Article 9 foreclosure is not an adequate remedy.*

A UCC foreclosure sale will result in irreparable harm to the Lender because, in addition to the extensive cost associated with taking possession of and storing the Borrowers' heavy equipment, it will yield only liquidation "fire sale" value for the Collateral far short of the amount owed, and the Borrowers have no other means or ability to repay its debt to the Lender. A UCC foreclosure sale will also likely result in piece-meal sales of the Collateral, rather than in connection with the operation of the Facilities and the Borrowers' business as a going concern, further depressing the sale price.

>    (c)   *A money judgment is not an adequate remedy.*

Likewise, the entry of a money judgment against the Borrowers is not an adequate remedy. It is undisputed that the Borrowers lack the financial ability to repay the Loans, have sustained

operating losses, and are struggling just to pay their operating expenses (let alone debt service). The Lender already has a first-priority lien on all of Borrowers' assets. Because the Borrowers lack the ability to pay a money judgment, damages alone are inadequate. The best opportunity for recovery is through the appointment of a receiver to stabilize, rehabilitate, and sell the Facilities and the Collateral through a fulsome marketing and sale process.

3. <u>The benefits of a receivership outweigh the burdens on the affected parties.</u>

Finally, the appointment of a receiver to stabilize and market the Collateral and the Facilities to potential purchasers, and to conduct a "going concern" receiver sale to a financially-viable business is in the best interest of all stakeholders. The Borrowers' employees and other creditors will benefit from the sale of the Collateral through a receivership. If the Borrowers are forced to shut down the Facilities, there will likewise be no economic recovery for the other stakeholders, including employees and the Borrowers' landlords. Accordingly, it is in the best interests of all affected parties for the receiver to stabilize operations and maximize the value of the Collateral as a going-concern.

## **CONCLUSION**

This Court should grant the relief sought in the Complaint, enter the Receivership Order, and grant such other and further relief as this Court deems just and proper. The Borrowers have consented to the appointment of a receiver, and the Lender is entitled to a receiver because (1) a receiver is necessary to protect the Lender's interest in the Collateral, (2) legal and less drastic equitable remedies are inadequate, and (3) the benefits of receivership outweigh the burdens on the affected parties. Thus, this Court should enter the Receivership Order.

        Respectfully submitted,

        **BRADLEY ARANT BOULT CUMMINGS LLP**

BY:  /s/ N. Christian Glenos
        **N. Christian Glenos**
        Texas Bar No. 24113073
        One Federal Place
        1819 Fifth Avenue North
        Birmingham, AL 35203-2104
        Telephone: (205) 521-8000
        cglenos@bradley.com

**OF COUNSEL:**

**Joshua A. Lesser**
State Bar No. 24116663
JPMorgan Chase Tower
600 Travis Street, Suite 5600
Houston, Texas 77002
Telephone: (713) 576-0300
Facsimile: (713) 576-0301
jlesser@bradley.com

**ATTORNEYS FOR CADENCE BANK**

**CERTIFICATE OF SERVICE**

  I certify that on this 10th day of April, 2024, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I further certify that a true and correct copy of the foregoing has been served on all parties' counsel of record as follows.

  Matthew B. Probus
  THE PROBUS LAW FIRM
  10497 Town and Country Way, Suite 930
  Houston, Texas 77024
  matthewprobus@theprobuslawfirm.com

  Jarrod B. Martin
  Amy C. Moss
  Chamberlain, Hrdlicka, White, Williams & Aughtry, P.C.
  Two Allen Center
  1200 Smith Street, Suite 1400
  Houston, Texas 77002
  Jarod.martin@chamberlainlaw.com
  Amy.moss@chamberlainlaw.com

            /s/ N. Christian Glenos
            OF COUNSEL